## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**CONSTANCE SMITH**                                                    **PLAINTIFF**

**v.**                            **CASE NO. 4:08-CV-00097 BSM**

**USABLE LIFE**                                                    **DEFENDANT**

## <u>ORDER</u>

Before the court are plaintiff's motion for summary judgment, or alternative motion

for trial, and defendant's motion for judgment on the record. For the reasons set forth below,

Plaintiff's motion for summary judgment, or alternative motion for trial, is denied and

defendant's motion for summary judgment is granted.

## I. BACKGROUND

Plaintiff Constance Smith ("Smith") was employed as an individual case underwriter

at Arkansas Blue Cross Blue Shield ("ABCBS"). Because of her employment, Smith was

eligible for coverage under a group long-term disability ("LTD") policy, which was issued

by USAble Life ("USAble"). The Policy provides, in pertinent part:

**PROOF OF DISABILITY**
When the Company receives proof that an insured is disabled due to sickness
or injury and requires the regular attendance of a physician, the Company will
pay the insured a monthly benefit after the end of the elimination period. The
benefit will be paid for the period of disability if the insured gives to the
Company proof of continued:

    1.    disability; and

    2.    regular attendance of a physician.

The proof must be given upon request and at the insured's expense.

. . .

## MENTAL ILLNESS LIMITATION

Benefits for disability due to mental illness will not exceed 24 months of monthly benefit payments unless the insured meets one of these situations:

1.  The insured is in a hospital or institution at the end of the 24 month period.  The monthly benefit will be paid during the confinement.

    If the insured is still disabled when he is discharged the monthly benefit will be paid for a recovery period up to 90 days.

    If the insured becomes reconfined during the recovery period for at least 14 days in a row, benefits will be paid for the confinement and another recovery period up to 90 more days.

2.  The insured continues to be disabled and becomes confined:

    a.  after the 24 month period; and

    b.  for at least 14 days in a row.

    The monthly benefit will be payable during the confinement.

The monthly benefit will not be payable beyond the maximum benefit period.

**HOSPITAL OR INSTITUTION** means a facility licensed to provide care and treatment for the condition causing the insured's disability.

**MENTAL ILLNESS** means mental, nervous or emotional diseases or disorders of any type.

[R. 13, 19].  The policy provides the following additional definitions:

**SICKNESS** means illness, disease, pregnancy or complications of pregnancy. The sickness must begin while the employee is insured under this policy.

2

**INJURY** means bodily injury resulting directly from an accident and independently of all other causes.  The injury must occur and disability must begin while the employee is insured under this policy.

> Exception:    Any disability which begins more than 60 days after an injury will be considered a sickness for the purpose of determining benefits under this policy.

. . .

**TOTAL DISABILITY or TOTALLY DISABLED** means during the elimination period and until the insured reaches the end of the maximum benefit period he is:

> 1.    unable to perform all of the material and substantial duties of his occupation on a full-time basis because of a disability:
>
>> a.    caused by injury or sickness;
>>
>> b.    that started while insured under this policy.

[R. 8, 10].

Smith has suffered from depression for many years and was first treated for depression in 1993. [R. 943].  Smith's date of disability was June 8, 2001. [R. 906].  Dr. Tharp, a psychiatrist, who began treating Smith in July 2001, diagnosed her with major depression and recurrent agoraphobia. [R. 951].  Dr. Tharp indicated that Smith had a complete limitation of functional capacity and marked limitations of mental functioning. [R. 951].  Smith began taking several psychotropic drugs for her anxiety and depression, including Celexa, Buspar, Amitriptyline, and Diazepam. [R. 936].

In September 2001, Smith's primary care physician, Dr. Gil Foster, sent her to a neurologist, Dr. Lon Burba, after plaintiff began complaining of decreased memory, confusion, equilibrium changes, and blackouts. [R. 910].  Her EEG was abnormal and

3

"characterized by bitemporal sharp and slow with a phase reversing T3 sharp wave which may reflect an area of cortex irritation in this region of the brain." [R. 905]. The report further states that "[t]his could be an interictal finding in a focal onset epileptiform disorder, but no definite epileptiform activity was seen." *Id.* On September 27, 2001, Dr. Brad Pierce indicated that Smith may have minimal small vessel ischemic changes, but no acute cortical or white matter infarction. [R. 297].

On October 22, 2001, an arterial Doppler scan indicated an abnormal right carotid duplex Doppler examination in which a small area of soft plaquing was present in the carotid bifurcation producing no greater than 30-40% diameter stenosis, and a mildly abnormal left carotid duplex Doppler examination in which a small amount of calcified plaque was present in the carotid bifurcation producing no greater than 30% diameter stenosis. [R. 296].

In November 2001, Dr. Burba referred Smith to Dr. Brad Baltz, a hematologist, due to "elevation of her leukocytosis, thrombocytosis and elevated alkaline phosphatase with positive ANA." [R. 654]. Although Dr. Baltz found that she might have early clinical B12 deficiency, her white count differential was normal with no variant forms and her platelet count was only mildly elevated. *Id.* Smith was treated throughout 2002, 2003, and 2004 with vitamins and B12. [R. 657-695, 740-748, 762-806].

Also in November 2001, Smith submitted a claim for LTD benefits stating that she was disabled due to anxiety, depression and agoraphobia. [R. 951-54]. Her request for disability benefits due to mental illness was approved on January 14, 2002, subject to the 24

month benefit limitation for mental illness, with benefits payable beginning December 5, 2001. [R. 906].

Upon Dr. Baltz's referral of plaintiff, Dr. Vestal Smith found that plaintiff's September 25, 2002, exam was "certainly not inconsistent with fibromyalgia," but plaintiff declined formal therapy or an exercise program due to her busy schedule. [R. 824].  Dr. Baltz's Attending Physician Statement dated October 29, 2002, stated that plaintiff's diagnosis of leukocytosis resulted in moderate physical limitation of functional capacity and moderate mental/nervous impairment. [R. 756].

Dr. Chris Cate performed a cholecystectomy, or gallbladder removal, on Smith in December 2002 due to her diagnosis of symptomatic gallbladder disease. [R. 167, 809].  Dr. Tharp's Mental Capacities Evaluation dated February 14, 2003, stated that Smith still suffered from major depressive disorder and agoraphobia, but that she "could possibly work from home if her ability to concentrate and focus improved." [R. 724].

In June 2003, Dr. AJ Zolten, a neuropsychologist, noted that Smith had been diagnosed with malabsorption syndrome and a mixed connective tissue disease, had an abnormal EEG, and had significant electrolyte imbalance. [R. 580].  Dr. Zolten found "average range general cognitive functioning with impaired verbal abstraction and mental arithmetic skills, borderline nonverbal abilities," a "significant decline from premorbid estimates of functioning," normal range memory with significant disruption of consolidation that appears to be related to impaired working memory," intact language and sensory

functioning, impaired motor functioning for gross and fine motor skills, and impaired executive functioning. [R. 584].  Dr. Zolten also concluded that her personality profile was consistent with significant depression with preoccupying somatic concerns, withdrawal, anxiety, and loss of control feelings, but was not "significantly associated with a seizure disorder." *Id.*  He attributed her profile to "metabolic dementia most likely associated with her malabsorption syndrome." *Id.*

Dr. Tharp's Mental Capacities Evaluation dated August 13, 2003, stated that Smith continued to suffer from major depressive disorder and agoraphobia, and that she "is not able to work at this time." [R. 642-44].  An MRI on August 15, 2003, indicated "[i]nterval progression of what represents very mild non-specific signal change in the deep white matter, probably due to small vessel ischemia," but revealed no "acute intracranial abnormality." [R. 368].

In September 2003, Dr. Burba conducted an EEG, in which he found "left temporal sharp and slow activity which may reflect an area of cortex irritation in this region of the brain and could be an interictal finding in a focal onset epileptiform disorder" or a structural lesion with secondary cortex irritation, but "no definite epileptiform events occurred." [R. 567].  A letter from Dr. Burba dated September 30, 2003, stated that Smith "has a medical disease process, not a psychiatric process that keeps her from working and disables her from any and all gainful employment at this time." [R. 631].  On October 15, 2003, a four-vessel

cerebral arteriogram revealed no significant carotid stenosis, and that the left vertebral artery occluded at its origin. [R. 365].

Dr. Burba's Attending Physician Statement dated December 8, 2003, stated that Smith had been diagnosed with leukocytosis, thrombocytosis, elevated alkaline phosphatase, positive ANA, malabsorption syndrome, depression, and agoraphobia, resulting in severe limitation of mental and functional capacity. [R. 616-17].  On December 9, 2003, Dr. Burba wrote a letter in support of disability stating that Smith "has been disabled with the basis of depression in the past[,]" but that she has "ongoing CSF pleocytosis related to some form of inflammation in the brain and spinal cord[,]" and an elevated white count peripherally. [R. 615].  He also suspected that her depression was "on the basis of some systemic, either infectious or immune-related disease," and that in his opinion, "she is unable to perform any form of gainful employment at this time."  *Id.*

On December 30, 2003, USAble informed Smith that her benefits should expire on December 5, 2001 "under the Mental and Nervous" two-year limitation.  [R. 614].  As noted below, USAble continued to pay her benefits until June 2006. [R. 64, 126-31].

On January 23, 2004, Dr. Burba referred Smith to Dr. Cummins Lue for a rheumatology consultation and further evaluation of a possible connective tissue disease. [R. 478].  Dr. Lue did not "know what the mentioning of mixed connective tissue disease was based on," and did not see any "obvious manifestations of an inflammatory polyarthritis." [R. 480].  However, he noted that connective tissue disease, including lupus and mixed

connective tissue disease, could cause systemic inflammation and included neurologic abnormalities. *Id.*

On February 10, 2004, Dr. Donald Abbott, a medical consultant for USAble, opined that "it appears that [Smith] does indeed have some cognitive problems that seem to be fairly well documented from the neuropsychologist," but that these problems may be due to her mental illness. [R. 547-48]. He also opined that the alleged physical problems were not substantiated. *Id.*

By letter dated May 7, 2004, Dr. Sami Harik informed Dr. Burba that many of the manifestations observed were "probably caused by the relatively large doses of psychiatric medications" plaintiff was taking, and suggested that the medications be "trimmed or discontinued." [R. 321]. He specifically noted that Smith could not explain proverbs or do simple mathematical operations and was somewhat inappropriate, but she was oriented, knew the day, date and year. *Id.* He also suggested a repeat spinal tap to "find out what happened to the pleocytosis." *Id.*

By June 3, 2004, Dr. Lue stated that Smith's neurological abnormalities were "still of somewhat uncertain etiology." [R. 483, 485]. However, on June 7, 2004, he noted that laboratory tests again showed the presence of lupus anticoagulant, but the IgM and IgG anticardiolipin antibodies were negative, although the IgG anticardiolipin antibody was previously borderline positive. [R. 486].

On August 4, 2004, Smith was admitted to the hospital for dehydration, headache, Infuse-A-Port malfunction, hiatal hernia, gastroesophageal reflux disease, chronic anemia, B12 deficiency, and polyneuropathy, and she was discharged on August 10, 2004. [R. 405]. On August 23, 2004, Smith's MRI indicated "[s]table foci of nonspecific T2 signal intensity in the subcortical white matter of the right frontal lobe and left parietal lobe[,]" which likely represent chronic small vessel ischemic changes, but no acute intracranial abnormality was evident. [R. 288].

An Attending Physician's Statement dated September 20, 2004, that appears to have been completed by Dr. Burba, set forth diagnoses of leukocytosis, thrombocytosis, elevated alkaline phosphatase, positive ANA, malabsorption syndrome, and multiple sclerosis. [R. 601-02]. On September 27, 2004, Dr. Foster submitted a Functional Capacity Form indicating a diagnosis of multiple sclerosis, permanent restrictions in all areas, no ability to return to work in the future, and no tolerance for standing, sitting, walking, lifting, or carrying. [R. 603].

A report dated October 3, 2004, stated, "There are no oligoclonal bands present in the CSF [cerebrospinal fluid]. A small percentage of patients with clinically definite MS are negative for oligoclonal bands." [R. 422]. On October 7, 2004, Dr. Lue reported that Smith "has had three positive lupus anticoagulants, but only two inconclusive anticardiolipin antibody levels." [R. 488]. Dr. Lue stated that she could have antiphospholipid antibody syndrome. *Id.*

9

On January 6, 2005, Smith started "anticoagulation for antiphospholipid antibody syndrome." [R. 490].  On February 20, 2005, Smith submitted a form indicating that her current medical problems included multi-infarct dementia, excessive blood clotting, mixed connective tissue disorder with malabsorption syndrom, and bleeding esophageal and gastric ulcers. [R. 592].

On January 3, 2005, Dr. Foster indicated that Smith had a thoracic vertebral fracture, multiple infarct dementia, and osteoporosis, and noted that plaintiff reported that "they have removed the diagnosis of multiple sclerosis." [R. 446].  On February 15, 2005, Dr. Stephen Ziller reported "[n]ear complete resolution of all significant GI symptoms," and "[m]ultiple other chronic, stable, inactive GI issues." [R. 346].

An Attending Physician's Statement completed on February 25, 2005, by Dr. Foster stated that Smith has a diagnosis of multi-infarct dementia confirmed by MRI evidence, and severe limitation of functional and mental capacity. [R. 598].  He indicated that plaintiff had regressed and did not expect significant improvement in the future due to "progressive, irreversible changes."  *Id.*

On May 9, 2005, Dr. Lue reported that Smith was "a patient with antiphospholipid antibody syndrome who has had some neurologic abnormalities in the past," but has "never had a complete loss of consciousness." [R. 328].  He opined her episode in which she passed out while sitting on the toilet in March 2005 was "somewhat suspicious for a syncopal episode," and "wonder[ed] whether a vasovagal response may have been involved." *Id.*  He

noted that Dr. Foster agreed and would arrange for Smith to see a cardiologist for possible cardiogenic syncope. *Id.*

On June 8, 2005, Dr. Greg Baden conducted an MRI and issued a report stating that there was no evidence of restricted diffusion to suggest acute ischemia, but there were "a few scattered subcortical and periventricular white matter T2 and FLAIR hyperintensities, which are nonspecific . . . [and] could represent changes of chronic small vessel ischemia but could also be related to migraine headaches." [R. 286].

On June 9, 2005, Dr. Thomas Reeder, a medical consultant for Disability Reinsurance Management Services, Inc. ("DRMS"), the claims administrator for defendant, conducted a medical file review, although he noted that some records may have been missing. [R.428-35]. Dr. Reeder concluded that Smith's "primary impairing condition was entirely psychiatric with marked somatic symptomatology," as there was "no support for diagnoses of malabsorption, mixed connective tissue disease, multiple sclerosis, hypercoagulable state, dementia, or brain infarcts." [R. 435]. He also concluded that Dr. Baltz's "consistent record of Karnofsky Performance Status of 90% was not consistent with physical functional impairment." *Id*. Dr. Reeder noted that "Electrodiagnostic testing was normal," "[n]o provider has documented neurological deficits," "there was no record of emergency treatment for severe headaches," and the "stocking glove sensory changes noted at one point were consistent with somatization and symptom magnification." *Id.*

In June and July 2005, Smith reported very elevated blood pressure. [R. 334-35].  Dr. Foster prescribed Lisinopril and considered discontinuing Geodon.  *Id*.  Dr. Stephen Greer performed a Head-Up Tilt Test, in which he noted some blood pressure lability, as well as a fairly significant drop in blood pressure, but did not find sufficient severity to produce frank syncope. [R. 237].

On September 2, 2005, Dr. Reeder conducted another medical file review due to the receipt of additional medical records. [R. 338-44].  Dr. Reeder opined that Smith's primary condition continued to be psychiatric, and her "markedly amplified symptoms would be most consistent with somatoform disorder."  He also stated that there was no evidence of malabsorption, a rheumatologic disorder, brain disorder, multiple sclerosis, brain infection, or any physical condition that would explain her symptoms or result in impairment. [R. 343].

On October 31, 2005, Dr. Reeder, once again, conducted a medical file review due to the receipt of additional medical data from Drs. Foster and Lue. [R. 323].  Dr. Reeder concluded that there was (1) evidence of hypertension, but no evidence of hypertensive effects or impairment; (2) weak evidence of lupus anticoagulant and anticardiolipin antibodies, but no evidence of functional impact from this; (3) no support for full anticoagulation with Coumadin, although anti platelet drugs could be considered; (4) no support for diagnoses of malabsorption, multiple sclerosis, mixed connective tissue disease, brain infarcts, or compression fracture of the thoracic vertebrae; (5) evidence of osteoporosis that would not be an impairing condition; (6) evidence of symptom magnification and

inconsistent physical findings, but no evidence for physical impairment; and (7) longstanding evidence of psychiatric dysfunction, including diagnosis of bipolar disorder and neuropsychiatric testing documentation of symptom magnification. [R. 325-26]. Dr. Reeder determined that Smith's psychiatric dysfunction was her primary condition. [R. 326].

On December 2, 2005, Dr. Alan Neuren, a medical consultant for DRMS, conducted a medical review of Smith's file. [R. 313-16]. He concluded that there were no findings that would indicate that Smith was physically incapable of functioning in the workplace from a physical condition. [R. 315]. On December 5, 2005, Dr. Neuren sent a letter to Dr. Harik requesting that he confirm that Smith's complaints and findings were a manifestation of non-organic issues, her CSF findings and enzyme abnormalities were most likely secondary to medications and would not have an impact on her function, that the medications may have affected her mentation, and that there was evidence of symptom embellishment and magnification. [R. 322]. Dr. Harik stated that he would not confirm the letter because he could not recapitulate their telephone conversation, but attached his letter to Dr. Burba dated May 7, 2004, because he derived his information regarding Smith from that letter. [R. 319].

On February 14, 2006, Dr. Burba wrote a letter disagreeing with Dr. Neuren's assessment. [R. 242]. He described Smith's persistent pleocytosis with greater than 100 white blood cells per high-powered field in her spinal fluid as markedly abnormal. *Id*. Burba agreed with Dr. Harik that Smith's medication may have "relatively immunosuppressed her" and caused her to have a septic meningitis, but opined that Smith

essentially had a chronic aseptic meningitis causing her to be weak, tired, and confused. *Id.* He also noted that Smith's mental status was not entirely normal, she was in chronic pain, and her CSF protein was always elevated. *Id.* Dr. Burba stated that Smith's abnormal white counts indicated an inflammatory reaction in the blood in the brain, and she had positive ANA markers, but specialists in hematology, rheumatology, and neurology had been unable to find the underlying etiology. *Id.* Although Dr. Burba acknowledged that there were "a lot of somatic complaints," he stated that there was "more than supratentorial disease" and opined that Smith was unable to function in the workplace. *Id.*

On March 31, 2006, Dr. Neuren performed another medical review concluding that Smith had a limited capacity, but that this was secondary to her underlying psychiatric condition in conjunction with the treatment she was receiving for it. [R. 241]. He also concluded that nothing suggested that the elevated white count and protein were due to an infectious or primary disease process, and the psychotropic medications could have affected her clarity of thought. *Id.*

By letter dated June 8, 2006, USAble informed Smith that although there was support for her psychological condition, there was no support for any physical conditions, and her benefits would cease due to the expiration of the 24-month mental illness limitation. [R.126-31]. On July 21, 2006, Dr. Burba drafted a "To Whom It May Concern" letter, stating that Smith had "persistent pleocytosis in her spinal fluid with at least 117 white blood cells per high-powered field and an elevated protein" and "persistent leukocytosis in the peripheral

blood." [R. 88].  He also stated that she "has had sort of a progressive mild cognitive dysfunction and what has been termed a mixed connective tissue disorder," although none of the doctors were able to understand her underlying disease process.  *Id.*  Dr. Burba stated, however, that depression does not cause white blood cells in the spinal fluid, and he suspected low-grade basilar meningitis producing a subcortical dementia.  *Id.*

On September 7, 2006, Dr. Lue stated that Smith has "neurologic abnormalities secondary to antiphospholipid antibody syndrome," and she would continue long-term anticoagulation under the direction of Dr. Baltz. [R. 201].  Dr. Foster's Patient Progress Sheet dated October 18, 2006, reported that plaintiff was found only partially responsive at home and was taken to the ER recently, where it was determined that she was moderately hypotensive. [R. 214].  The same day, Dr. Foster wrote a letter stating that Smith was "cognitively unstable" and had a "fairly significant problem with labile hypertension" which had precipitated "several episodes of decreased or complete lack of responsiveness," and he did not "feel comfortable clearing her for routine job duties or self-transport, except for possibly very short car trips." [R. 121].  He also stated that he did not believe that she was in any way feigning symptoms or malingering.  *Id.*

Smith's mother prepared Smith's appeal letter dated November 21, 2006, because Smith could "no longer type accurately nor organize her thoughts to put on paper." [R. 82]. The appeal noted that the diagnosis of multiple sclerosis was in error, and that once Smith began blood thinner treatment, the increase of neurological symptoms stopped and stabilized

to a certain extent. *Id*. It also stated that the vertebrae fracture occurred in September 2004, and that Smith could no longer use a computer, could walk only a short distance, and could drive only within one to two miles of her home when she feels well. [R. 83]. Further, the appeal stated that Smith's memory problems were short term, there were many witnesses to her falls, she had discontinued all psychiatric medicine and treatment, and she was never diagnosed with bipolar disorder. *Id*. The appeal explains that she turned down the exercise program for fibromyalgia because she believed the doctor told her there was no evidence of the condition, her "only pain was from her headaches," and she "[n]ever had muscle pain." *Id*. It also detailed Smith's cognitive problems, and provided summaries of her physician's opinions, symptoms, and medications. [R. 84-86]. In response to USAble's letter request for information dated December 20, 2006, Smith explained her blackouts, but stated that the doctors did not "think for sure that these are strokes." [R. 77-79].

On February 27, 2007, Dr. Karen Kane, Board Certified in Internal and Occupational Medicine, and Dr. Steven McIntire, a Board Certified Neurologist, conducted a dual file review. [R. 139-73]. The report provides a detailed review of Smith's medical documents, and summaries of consultations with Drs. Foster and Baltz. [R. 139-65].

According to the report, Dr. Foster stated that Smith's current working diagnosis was anti-phospholipid syndrome, which was treated with Coumadin, but he did not notice any change in her baseline symptoms after the anticoagulant therapy began. [R. 163]. Dr. Foster was unaware of how the diagnosis of malabsorption was made, and the diagnosis of mixed

connective tissue disorder was not supported by the rheumatologist. *Id*. Dr. Foster noted that Smith was not on any treatment for either diagnosis. *Id*. Her diagnosis of a seizure disorder had been discarded. *Id*. As to Smith's hypertension, Dr. Foster had been weaning plaintiff down on her blood pressure medications. [R. 164]. Dr. Foster reported that although Smith had rare episodes of speech difficulty, incoordination, and confusion once or twice per year, she did not appear to have any significant cognitive difficulties. *Id*. Dr. Foster was unsure if Smith could return to work, noting her episodes and that it may not be safe for her to drive or operate hazardous equipment. *Id*. However, Dr. Foster felt that between these rare episodes, Smith was capable of sedentary activities, as there were no continuous cognitive deficits that would prevent her from working. *Id*. Dr. Foster confirmed the accuracy of this summary. [R. 138].

The report notes that Dr. Baltz indicated that Smith's diagnoses of vitamin B12 deficiency, malabsorption syndrome, mixed connective tissue disorder, and seizure disorder were made several years ago. [R. 165]. He indicated that Smith was receiving vitamin B12 injections at the time, although he did not know what specific testing was done to confirm the vitamin B12 deficiency diagnosis. *Id*. As to the malabsorption syndrome, Dr. Baltz reported that Smith appeared to be chronically ill, frail, and weak, but her weight was stable, and he could not attribute her appearance to malabsorption syndrome or any of her other diagnoses, including depression. *Id*. He deferred conclusions regarding mixed connective tissue disorder to Dr. Lue, but was unaware of any specific treatment for this diagnosis. *Id*.

17

He also deferred to Dr. Burba regarding the diagnoses of seizure disorder, chronic meningitis, and headaches *Id*. With regard to Smith's ability to work, he noted her frail and weak appearance, that her gait appeared unsteady, and that she wobbled down the hallway at his office. *Id*. As to her ability to do sedentary work, Dr. Baltz was unable to confirm or refute Smith's self-assessment that she feels too ill to work related to headaches, muscle weakness, and generally feeling unwell, and was unable to determine how these symptoms impact her ability to function. *Id*.

Dr. Kane concluded that it was "medically plausible that [Smith] would be limited to sedentary to light activities," and recommended that she "not do tasks that would put her at risk of serious injury should her blood pressure drop and provoke a syncopal episode or should she experience an intracranial bleed." [R. 168-69]. Dr. Kane stated that Smith may have fibromyalgia syndrome, although the objective documentation did not fully meet the ACR criteria for the diagnosis. [R. 169]. Regardless, Dr. Kane stated that the fibromyalgia diagnosis did not translate into any specific functional limitations, and there is no medical evidence to support the need for activity restrictions for patients with fibromyalgia. *Id*. Dr. Kane was not convinced that Smith ever had a vitamin B12 deficiency, and even if she had, there was no objective evidence of any functional impairment related to this diagnosis. *Id*. Dr. Kane stated that the medical records did not support the diagnosis of mixed connective tissue disorder, and thus, no specific restrictions or limitations were indicated. *Id*.

18

Dr. Kane opined that Smith probably had anti-phospholipid syndrome, and that it was "remotely possible that the episodes she describes with slurred speech and confusion" were related to thrombotic events associated with the condition, but have not had any lasting neurologic impairments. [R. 170].   However, due to the rarity of these events, the only limitations or restrictions would be that Smith not do tasks that would put her at risk of serious injury, as set forth above.   *Id*.   In sum, Dr. Kane opined that Smith "should do sedentary to light activities with no lifting over 20 pounds and should be restricted from safety-sensitive tasks based on her non-neurological conditions."   *Id*.

Dr. Kane deferred to Dr. McIntire regarding the possible diagnosis of multi-infarct dementia and other neurological diagnoses, including possible seizure disorder, chronic meningitis, gait disturbance, and migraines.   *Id*.   Dr. McIntire opined that "the provided records do not support a neurological condition that is physically or cognitively functionally impairing."   *Id*.

On April 5, 2007, USAble upheld the termination of LTD benefits. [R. 62-69].   On May 21, 2007, Smith filed her notice of second appeal. [R. 60].   On November 12, 2007, USAble again upheld the denial of Smith's claim for LTD benefits. [R. 45-49].   Smith filed her complaint in Pulaski County Circuit Court on December 6, 2007.   USAble removed the action to this court on February 4, 2008.

19

## II.  STANDARD OF REVIEW

An administrator's decision to deny benefits under an employee welfare plan is reviewed *de novo*, unless the benefit plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). Here, because defendant admits that the benefit plan does not grant it discretionary authority, the court reviews the claims administrator's decision under a *de novo* standard of review. Under the *de novo* standard of review, the court interprets the terms of the plan by giving the language its common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words to mean. *Adams v. Cont'l Cas. Co.*, 364 F.3d 952, 954 (8th Cir. 2004).  "[A] court construing plans governed by ERISA should construe ambiguities against the drafter only if, after applying ordinary principles of construction, giving language its ordinary meaning and admitting extrinsic evidence, ambiguities remain." *Delk v. Durham Life Ins. Co.*, 959 F.2d 104, 106 (8th Cir. 1992).

## III.  DISCUSSION

USAble asserts that under the terms of the policy, Smith has the burden of providing sufficient proof to demonstrate that she is entitled to benefits.  USAble states that "[i]t is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence." *Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 839 (8th Cir. 2006) (citing *Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793, 799 (8th Cir. 2002) (finding denial of

benefits not unreasonable under abuse of discretion standard where objective medical evidence did not support claimant's contention that he was disabled by diabetes and syncopal episodes).

Smith contends that there is objective evidence of her disability. Specifically, she states that the antiphospholipid antibody is associated with illnesses, including thrombosis, stroke, infarction, phlebitis, premature miscarriages, thrombocytopenia, livedo reticulris, migraine headaches, transverse myelitis, and systemic lupus erythematosus.

Smith also asserts that the policy does not address co-morbid conditions, rendering the plan language regarding mental illness ambiguous. Thus, she requests that the court construe the ambiguity against defendant, and interpret the phrase "mental illness" to exclude mental conditions resulting from physical disorders. Furthermore, Smith asserts that the record is flagrantly deficient because there is no documentation regarding her vocational ability. *See Gunderson v. W.R. Grace & Co. Long Term Disability*, 874 F.2d 496, 499 (8th Cir. 1989) (holding that there was not substantial evidence to support the defendant's decision to terminate benefits without a vocational expert's opinion to determine if plaintiff was capable, in light of his physical impairment, to perform "any occupation"); *but see Davis v. American Gen. & Acc. Inc. Co.*, 906 F. Supp. 1302, 1310 (E.D. Mo. 1995) (holding that consideration of vocational evidence is unnecessary where the evidence in the administrative record supports the conclusion that claimant does not have an impairment which would prevent him from performing some identifiable job, and stating that the Eighth Circuit has

limited *Gunderson* to its facts).   Plaintiff asserts that an award of benefits, rather than remand, is appropriate.

In response, USAble asserts that there is no evidence that Smith suffers from a non-mental illness that made her physically unable to work.   USAble states that the policy definition of "mental illness" is not ambiguous under Eighth Circuit precedent.   *Stauch v. Unisys Corp.*, 24 F.3d 1054, 1056 (8th Cir. 1994) (holding that the district court correctly focused on the symptoms of plaintiff's illness in order to determine whether plaintiff's illness fell within the mental illness limitation provision of the policy); *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150 (8th Cir. 1990) (rejecting the district court's limitation of "mental illness" to only those illnesses that have a non-organic origin, and stating that "illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause").   Additionally, USAble asserts that Dr. Harik found that the presence of white blood cells in Smith's spinal fluid was likely the result of psychotropic drugs.   USAble further asserts that evidence of Smith's vocational capability is not relevant in this case because no physically impairing condition unrelated to her mental illness was identified.

USAble contends that a layperson would associate the symptoms described by Dr. Burba, such as cognitive dysfunction and dementia, with mental illness, which is defined as "mental, nervous or emotional diseases or disorders of any type."   USAble also states that Smith's disabling symptoms of depression, loss of memory, and fatigue are symptoms

associated with a mental or nervous illness.  In *Stauch*, the Eighth Circuit held that the plaintiff fell within the "mental illness" limitation of the policy because a layperson would conclude that the plaintiff suffered from a "mental, nervous or emotional disease or disorder of any type" based upon his symptoms of "depression, fatigue, irritability, sleeplessness, poor appetite, and impaired concentration and memory."  24 F.3d at 1056.  *See also Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 841 (8th Cir. 2001) (holding that although the plaintiff had been diagnosed with tachycardia, "[g]iven the absence of any objective medical finding that [plaintiff's] condition [was] caused by a physical heart disease or disorder," laypersons would consider his disabling symptoms of fatigue, anxiety, and dizziness brought on by work-related stress to be the result of a "nervous disorder," and thus fell within the mental illness limitation).

The court notes that Smith's treating physician, Dr. Foster, recently opined that Smith was capable of sedentary activities, as there were no continuous cognitive deficits that would prevent her from working, although he noted that her episodes may result in certain limitations, including restrictions from driving and operating hazardous equipment.  With regard to Smith's ability to work, Dr. Baltz noted her frail and weak appearance, that her gait appeared unsteady, and that she wobbled down the hallway at his office, but he was unable to confirm or refute Smith's self-assessment that she feels too ill to work due to headaches, muscle weakness, and generally feeling unwell and was unable to determine how these symptoms impact her ability to function.

Dr. Burba, Smith's neurologist, stated that Smith has "persistent pleocytosis in her spinal fluid with at least 117 white blood cells per high-powered field and an elevated protein," "persistent leukocytosis in the peripheral blood," progressive mild cognitive dysfunction, mixed connective tissue disorder. He suspected low-grade basilar meningitis producing a subcortical dementia. It appears, however, that Dr. Lue, Smith's rheumatologist, did not confirm the diagnosis of mixed connective tissue disorder. Also, the record does not contain support for the diagnosis of malabsorption, and according to Dr. Foster, Smith is not being treated for it.

Although Dr. Lue stated that Smith has "neurologic abnormalities secondary to antiphospholipid antibody syndrome," Dr. Foster stated that he did not notice any change in her baseline symptoms after beginning the anticoagulant therapy. Dr. Foster also stated that Smith "has fairly significant problem with labile hypertension which has precipitated several episodes of decreased or complete lack of responsiveness." Dr. Foster acknowledged that her hypotension could be related to over medication for hypertension or a side effect of Amitriptyline, and had been weaning Smith down on her blood pressure medications. However, he reported that Smith had only rare episodes of speech difficulty, incoordination, and confusion once or twice per year, and did not appear to have any significant cognitive difficulties.

Dr. Kane, a medical reviewer for USAble, concluded that Smith "should do sedentary to light activities with no lifting over 20 pounds and should be restricted from safety-

sensitive tasks based on her non-neurological conditions."  Dr. Kane acknowledged that Smith probably had anti-phospholipid syndrome, and that it was "remotely possible that the episodes she describes with slurred speech and confusion" were related to thrombotic events associated with the condition, but due to the rarity of these events, only the limitations and restrictions set forth above would be necessary.  Although Dr. Kane acknowledged that Smith may have fibromyalgia syndrome, she noted that the objective documentation did not fully meet the ACR criteria for the diagnosis, and there was no evidence of resulting functional limitations from fibromyalgia.  Furthermore, the court notes that in her November 2006 appeal letter, Smith states that her "only pain was from her headaches," and she "[n]ever had muscle pain."  Dr. McIntire, a medical reviewer for USAble, opined that the records did not support a physically or cognitively functionally impairing neurological condition, in addressing the possible diagnosis of multi-infarct dementia and other neurological diagnoses, including possible seizure disorder, chronic meningitis, gait disturbance, and migraines.

The Eighth Circuit has instructed:

The cause of a disease is a judgment for experts, while laymen know and understand symptoms. Laymen undoubtedly are aware that some mental illnesses are organically caused while others are not; however, they do not classify illnesses based on their origins. Instead, laypersons are inclined to focus on the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause.

25

*Brewer*, 921 F.2d at 154 ("By focusing upon the disease's etiology, the district court considered factors that are important to experts but not to laypersons. The court thus failed to examine the term 'mental illness' as a layperson would have, which is the examination we conclude ERISA and federal common law require."). For the purpose of determining Smiths' entitlement to disability benefits, the varying opinions of doctors regarding the cause of Smith's illness are not material. *Stauch*, 24 F.3d at 1055-56. Rather, the relevant question is whether the illness falls within the mental illness limitation provision of the disability policy. *Id*.

Dr. Burba reports that Smith is weak, tired, and confused. Although Dr. Burba also reports that Smith is in chronic pain, in her appeal letter, Smith states that her only pain is from her headaches. Dr. Baltz notes Smith's frail and weak appearance and unsteady gait. Although several courts have disagreed with the *Brewer* court's emphasis on symptoms, this court is bound by Eighth Circuit precedent. The application of *Brewer*, *Stauch*, and *Walke* to this case compels the conclusion that Smith suffers from a disability that falls within the "mental illness" limitation of the policy because a layperson would conclude that she suffers from a "mental, nervous or emotional disease or disorder of any type" based upon her symptoms. Therefore, the court upholds USAble's denial of benefits under the mental illness limitation.

Furthermore, although the court does not doubt that Smith experiences some cognitive difficulties from time to time, which may very well be related to her anti-phospholipid

syndrome, Smith's own physician acknowledges that she has no significant cognitive difficulties and can perform sedentary work with certain restrictions. Although Smith claims that she cannot organize her thoughts or type sufficiently, even excluding the appeal letter prepared by Smith's mother, the submissions by Smith do not completely support this claim. Here, the record supports the conclusion that Smith can perform sedentary work with certain restrictions. The policy requires that plaintiff be "unable to perform all of the material and substantial duties of *[her] occupation* on a *full-time basis* because of a disability." (Emphasis added). Although there has been no evidence as to the material and substantial duties of Smith's occupation as an individual case underwriter, the position is almost certainly a sedentary one.

Accordingly, defendant's motion for judgment on the record (Doc. No. 14) is granted, and plaintiff's motion for summary judgment, or alternative motion for trial, (Doc. No. 16) is denied. Plaintiff's complaint is dismissed with prejudice.

IT IS SO ORDERED THIS 21st day of November, 2008.

_____
UNITED STATES DISTRICT JUDGE